Tracee Quinnell                                    May 08, 2018

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

EQUAL EMPLOYMENT            )
OPPORTUNITY COMMISSION,)
                            )
     Plaintiff,             )
                            )
     v.                     )Civil Action No.
                            )5:16-cv-00758-FB-RBF
NABORS CORPORATE            )
SERVICES INC., AND C&J      )
WELL SERVICES, INC.,        )
                            )
     Defendants.            )

* * * * * *

VIDEOTAPE
DEPOSITION OF:          TRACEE QUINNELL

DATE:                   MAY 8, 2018

TIME:                   8:53 a.m. - 6:25 p.m.

PLACE:                  HAMPTON INN & SUITES
                        62 PINE RIDGE ROAD
                        BLAIRSVILLE,
                        PENNSYLVANIA  15717

REPORTER:               SUSANNA C. ENGLERT

* * * * * *

```
 1   APPEARANCES:

 2

 3   Appearing on behalf of the Plaintiff:

 4        DAVID RIVELA, ESQUIRE
          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
 5        5410 Fredericksburg Road, Suite 200
          San Antonio, Texas 78229-3555

 6   Appearing on behalf of the Defendant:

 7        JAMES M. CLEARY, ESQUIRE
          MARTIN, DISIERE, JEFFERSON & WISDOM
 8        808 Travis, 20th Floor
          Houston, Texas 77002

 9
     Also Present:
10
          BRANDON WILCZEK, VIDEOGRAPHER
11
                         -  -  -
12
                      STIPULATION
13
          It is stipulated and agreed by and among
14   counsel for the respective parties and the deponent
     that the inspection, reading and signing of the
15   deposition may be and are waived.

16                       -  -  -

17

18

19

20

21

22

23

24

25
```

```
 1    your previous answers.
 2              Is there something that you wanted to
 3    clarify for the record?
 4         A    Yes, please.  I apologize.  I don't
 5    think I was understanding your question properly.
 6         Q    Sure.
 7         A    I was answering your question about
 8    if -- if the legal team was guiding.  I was
 9    answering that in a broad scope of my job as a
10    whole.  And they don't typically do that.  I
11    didn't realize that you were asking specific to
12    this investigation here.
13              And after the first report from Duane
14    Jewell to John Lewis, I did go to, I believe it
15    was Grant Dorfman, and then Nabors did -- Nabors
16    law department did guide the investigation from
17    there.
18              So I apologize.  I was answering in
19    broad scope, not just for this investigation.
20         Q    Okay.  Okay.  And I'm going to go into
21    a little bit more specifics when we start going
22    through the documents --
23         A    Okay.
24         Q    -- concerning the investigation.
25    Before we get into that investigation, let me ask
```

```
 1   off that we had re-reviewed the business -- the
 2   code of business conduct and numerous other
 3   policies from Nabors.
 4       Q     Okay.  Let me just go over that real
 5   quick.  I've got some exhibits that were
 6   provided -- some documents that were provided by
 7   NCPS.
 8             MR. RIVELA:  Mark this as an exhibit,
 9   please.
10             (Quinnell Exhibit No. 5 marked for
11   identification, attached hereto.)
12   BY MR. RIVELA:
13       Q     I've handed you what's been marked as
14   Exhibit 5 for identification.
15             Do you recognize this document?
16       A     It looks vaguely familiar, yes.
17       Q     Was this training that had been
18   provided -- or did you receive this particular
19   training in this -- in this particular document?
20       A     I don't remember exactly receiving it,
21   but it looks like something that I would and
22   should have received, yes.
23       Q     Did Julia Wright ever provide personal
24   training to you -- or let me rephrase that.
25             Did Julia Wright do a presentation that
```

```
 1    you attended concerning harassment and

 2    retaliation?

 3         A      Yes.

 4              MR. RIVELA:  I'll have this marked as

 5    an Exhibit.

 6    BY MR. RIVELA:

 7         Q      Do you know whether this -- was this

 8    particular training, Exhibit No. 5, was that

 9    provided to other employees of NCPS?

10         A      I believe this was training that we

11    asked Julia to do, and I believe it was given to

12    at least to our management level employees.

13         Q      We you say "we asked them to do," who

14    asked her to do --

15         A      NCPS.

16         Q      Okay.  Was that a request by Frank

17    Labrenz?  Was it somebody individually that made

18    the request, or do you recall?

19         A      I would say I would have made the

20    request.

21         Q      Okay.

22              MR. RIVELA:  Could I have this marked

23    as Exhibit 6, please.

24              (Quinnell Exhibit No. 6 marked for

25    identification, attached hereto.)
```

 1     your previous answers.

 2              Is there something that you wanted to

 3     clarify for the record?

 4        A     Yes, please.  I apologize.  I don't

 5     think I was understanding your question properly.

 6        Q     Sure.

 7        A     I was answering your question about

 8     if -- if the legal team was guiding.  I was

 9     answering that in a broad scope of my job as a

10     whole.  And they don't typically do that.  I

11     didn't realize that you were asking specific to

12     this investigation here.

13              And after the first report from Duane

14     Jewell to John Lewis, I did go to, I believe it

15     was Grant Dorfman, and then Nabors did -- Nabors

16     law department did guide the investigation from

17     there.

18              So I apologize.  I was answering in

19     broad scope, not just for this investigation.

20        Q     Okay.  Okay.  And I'm going to go into

21     a little bit more specifics when we start going

22     through the documents --

23        A     Okay.

24        Q     -- concerning the investigation.

25     Before we get into that investigation, let me ask

 1   through it and then I can make a decision if I

 2   think more people need to be interviewed, if

 3   additional questions need to be asked.  I would

 4   ask those questions after she submits the report

 5   to me.

 6        Q     Okay.  Do you recall reviewing this

 7   particular report?

 8        A     Yes.

 9        Q     And if I recall, Miss Nguyen basically

10   is concluding that there was no discrimination

11   found by Mr. Bicknell?

12        A     That's what it reads.

13        Q     Is that what you were notified by

14   Miss -- or do you recall, did she tell you that?

15        A     I was given this report.

16        Q     Okay.  Now, when -- after an initial

17   investigation has been done, such as here with

18   respect to Mr. Parrish, now was it the practice

19   for Deidre Nguyen to send you a preliminary

20   report as to what she was going to recommend?

21        A     No.  As I said, she would send me this

22   actual report --

23        Q     Okay.

24        A     -- and then I would look it over and

25   ask questions if I had them.

1       Q       Now, from your perspective, once you

2    got this particular report, did you notify

3    anybody from NCPS concerning the report?

4       A       Oh, of course.  I would have had to

5    notify the management team.

6       Q       Which management team had -- or who on

7    the management team would you have notified?

8       A       I would have had to notify John Lewis,

9    and potentially Rick Jacquier, who was John's

10   boss.  I don't know whether I did or not, but

11   typically, something of this level, I would have

12   notified Rick as well.

13      Q       Was Rick Jacquier involved in the

14   decision-making as to what actions to take

15   concerning this investigation?

16      A       Yes, he was.

17      Q       Did Mr. Jacquier have any involvement

18   in any decision to terminate Mr. Parrish by NCPS?

19      A       We would have ran it past him, of

20   course.

21      Q       Did he ultimately instruct NCPS

22   management to terminate Mr. Parrish?

23      A       I don't remember if it was him, but

24   management does always have the ultimate

25   decision.  HR doesn't have that power, if you

```
 1    will.  We make a recommendation, but it's always
 2    management's decision to do a termination.
 3         Q     Now, with respect to terminating
 4    Mr. Parrish, was -- did -- you have Rick
 5    Jacquier, who was, you said, would have been --
 6    that he would have been part of the process, I
 7    guess, of deciding what to do.
 8               Was there anybody else from Nabors
 9    management who was part of that process
10    concerning Mr. Parrish?
11         A     Are you asking me if legal was involved
12    or --
13         Q     Well --
14         A     When you say "Nabors," that means
15    parent company to me.
16         Q     With respect to Parrish, were they also
17    part of that process?
18         A     Yes, legal was involved, yes.
19         Q     Okay.  Was there anybody in particular
20    from legal who you recall being involved in that
21    decision?
22         A     I don't remember specifically, but I
23    think at this point we had Julia Wright involved.
24         Q     Okay.  And I'm not going to ask you
25    concerning advice, but -- or what specifically
```

```
 1        Q      Did you ever come down and visit with

 2   Miss Nguyen-Do in her regional office in

 3   Pleasanton, Texas?

 4        A      Yes.

 5        Q      Did you ever go over any of the

 6   documents in her files?

 7        A      I never dug through her files.

 8        Q      Okay.  Did you give any instructions to

 9   your regional managers as to the proper method of

10   maintaining records as to investigations?

11        A      Yes.

12        Q      Okay.  And was part of that

13   instruction -- did you tell them, "You need to

14   keep your notes of these investigations

15   maintained in the file?

16        A      Certainly.  When there was a

17   preservation of records request, we asked that

18   everything was kept together.

19        Q      Now, with respect to this investigation

20   concerning Parrish, at any point did you ever go

21   back and review the records of Mr. Par- -- of the

22   investigation of Mr. Parrish's allegations?

23        A      What do you mean "the records"?

24        Q      Like whatever records of an

25   investigation file -- that were maintained in a
```

1    file.

2         Q     Who is Wilma?

3         A     Wilma Southern was our file clerk.

4         Q     She worked in Houston or in --

5         A     She worked in Houston, under me.

6         Q     So this document would have been kept

7    in Houston in the NCPS HR department's files?

8         A     Yes.  It would have been kept there

9    along with the dated files that were kept in my

10   office.

11        Q     Did you -- were you supportive of

12   Miss Nguyen-Do in -- or first of all, do you know

13   how this came about?  Who was the person who

14   actually made the decision to go ahead and issue

15   a counseling to Mr. Parrish concerning the

16   investigation?

17        A     Deidre would have run that past me.

18        Q     Okay.  Did she have to get permission

19   from anybody in NCP -- anybody else in NCPS

20   concerning that recommendation?

21        A     We would have run this past legal as

22   well.

23        Q     Okay.  So before it was done, it would

24   have been run past legal?

25        A     Yes.

1    department for further investigation?

2         A    Yes, they would have been aware.

3         Q    In this case, did they investigate

4    further?

5         A    I don't know.

6         Q    If they had, would there have been some

7    record that would have been kept by NCPS?

8              MR. CLEARY:  Objection.  Calls for

9    speculation.  Lack of foundation as to this

10   witness.

11             THE WITNESS:  I don't know where

12   legal's records were kept.

13   BY MR. RIVELA:

14        Q    If there had been a further

15   investigation of the allegations by NCPS HR,

16   would those records have been maintained as part

17   of a file by NCPS HR department?

18        A    If I had anything further, yes, they

19   would have been kept together.

20        Q    Would it have violated the company's

21   policies if Deidre Nguyen-Do had not maintained

22   those records?

23        A    I don't know if there was a

24   preservation of records request sent out.  And

25   that's when records we mandated they should be

1    maintained.  Beyond that, what she maintained in

2    her notes, I was comfortable with here.

3         Q     When you say a "preservation of records

4    request," can you explain to the Court, what are

5    you referring to?

6         A     Yes.  Legal sometimes in situations,

7    they would sent out a preservation of records

8    request notifying anybody who might have any hand

9    in an e-mail, a handwritten note, any type of

10   communication regarding a situation and -- that

11   nothing was to be destroyed, everything had to be

12   kept.

13        Q     Now, with respect to Mr. Parrish's --

14   this investigation, we know at a certain point

15   there had been a charge filed by Mr. Parrish.

16              Before I get to that question, the

17   request, would it have been made to the director

18   of human resources if there had been a

19   preservation request made by legal concerning an

20   investigation?

21        A     It would go typically to the director

22   of human resources.  It would also go to the IT

23   department.

24        Q     And I guess, just so I'm clear -- so

25   you're clear on the record, do you know whether

1    or not, with respect to Mr. Parrish's -- the

2    investigation notes of Mr. Parrish, was there

3    ever a preservation request made as to those

4    documents that were part of the investigation?

5         A    I --

6              MR. CLEARY:  Objection.  Asked and

7    answered.

8    BY MR. RIVELA:

9         Q    The question --

10        A    I don't know.

11        Q    You don't know, okay.

12             Now, would you agree that at the time

13   that the decision was made to terminate

14   Mr. Parrish that you understood there could be

15   legal consequences to terminating Mr. Parrish?

16        A    Not to terminating him.  I wanted to

17   take a look at the situation and make sure our

18   actions were not retaliatory before we

19   recommended the termination.

20        Q    Okay.  But you did, for the report,

21   this particular e-mail from Miss Nguyen-Do does

22   mention that Mr. Parrish is of a protected

23   class -- or because Mr. Parrish is a protected

24   class, we have to deal with some legal and/or

25   governmental agencies letter [sic] -- we may have

1   this, but it's unclear who actually is being

2   interviewed.

3          Or first of all, I guess before I get

4   to that: What are the notes -- what was being

5   recorded in these notes?

6      A    So after Duane Jewell talked with John

7   Lewis, we immediately, same day, started looking

8   into the situation.  And I physically left, I

9   believe, the next morning and drove myself --

10  drove or flew to Pleasanton and then sat down

11  with employees there to get their side of the

12  story to see if we had an issue.

13     Q    Do you know what Duane Jewell was

14  specifically reporting to John Lewis?  What did

15  he specifically tell him was going on that he

16  felt was discriminatory?

17     A    I can't remember.  I sent an e-mail, I

18  believe, to either John -- I sent it to John or

19  John sent it to me after with the details.  But I

20  don't recall them specifically.

21     Q    Did you send an e-mail the day that

22  John Lewis informed you as to what Duane Jewell

23  was alleging?

24     A    Yes, I believe I sent an e-mail to

25  legal that day.

```
 1    conference room during those interviews?

 2         A     No, there was never a camera in there.

 3         Q     The questions that you provided -- or

 4    that you asked, were you given any sort of

 5    suggestions as to what information should have

 6    been garnered from these witnesses?

 7         A     Sure.  Legal gave me some guidance on

 8    what to ask.

 9         Q     So the first person who was

10    interviewed, was that Duane Jewell who you

11    interviewed first?

12         A     I don't know what order these

13    interviews went in.

14         Q     And they don't have any dates on it.

15    So I'm wondering if you would remem- -- like,

16    were these all during the course of a week, or

17    was it a longer period, or do you know what

18    period of time it took to get these interviews

19    done?

20         A     I believe these were done in the course

21    of just a couple days.

22         Q     A couple of days.  Who made the

23    decision as to who actually to interview in

24    these -- in these interviews?

25         A     Julia Wright and I.  But Julia.
```

```
 1   by James Hacker; is that right?
 2        A     Yes.
 3        Q     And so are those numbers, do they
 4   correlate with questions that you had written out
 5   to ask James Hacker?
 6        A     I believe I had written questions to
 7   ask James Hacker, not the other employees.  So
 8   yes, that's what they would correlate with.
 9        Q     Okay.  Did you happen to keep a copy of
10   the questions that you had actually asked James
11   Hacker?
12        A     I don't know.  If it's not attached to
13   here, then I would say it's not available.
14        Q     Did you ever document the substance of
15   the discussion -- of the interviews that you had
16   with these witnesses in another format after
17   these interviews were conducted?
18        A     That was a really messy question.  Can
19   you try again?
20        Q     Let me just get to -- let me ask you a
21   more direct question.
22              Are there e-mails or reports that you
23   created that documented the substance of what
24   information was told to you by these witnesses?
25        A     Yes, there are.  And they're from me
```

```
 1   compiling everything, sending to legal.
 2       Q     So you sent them to Nabors Corporate
 3   Services legal department?
 4       A     To, I believe, Julia Wright, maybe
 5   directly.
 6       Q     Okay.  Were any of those e-mails -- or
 7   did you send any sort of documentation to anybody
 8   else?  I'm not talking about the ones you sent to
 9   legal, but were there other ones you sent to
10   other people within Nabors -- NCPS?
11       A     I don't believe so.  During the course
12   of the investigation, all of my information was
13   sent just to legal.
14       Q     Did Deidre Nguyen ever send you any
15   sort of documentation that she might have created
16   concerning these interviews?
17       A     I don't remember.
18       Q     At a certain point, did -- did you
19   receive a -- I'm trying to remember the term you
20   used previously in your testi- -- deposition.  An
21   order to preserve documents.
22             Do you know what I'm talking about?
23       A     Preservation of records.
24       Q     A preservation of records that you
25   described.
```

```
 1    record.   The time is 2:11:00 p.m.

 2              (Break taken in the deposition.)

 3              THE VIDEOGRAPHER:  We are on the

 4    record.   The time is 2:21 p.m.

 5    BY MR. RIVELA:

 6       Q     Miss Quinnell, we were referring -- we

 7    stopped in my questions to you.  We were on

 8    Nabors/EEOC 011646.  And this has to do with Zach

 9    Johnson I believe his name is.  Is that right?

10       A     Yes.

11       Q     Okay.  Let me see if I can speed this

12    up a little bit.

13              Did Zach Johnson mention to you that he

14    was on an insulin pump and has diabetes during

15    the interview?  Is that what he -- what you're

16    documenting on this?

17       A     Well, back up.  You asked me why I

18    interviewed him.

19       Q     Okay.  Yes.

20       A     And so I looked on the break.

21       Q     Okay.

22       A     It's because Trevor Corley had brought

23    up Zach's name.  So that's why I interviewed

24    Zach.

25       Q     Okay.  Okay.  Thank you.
```

```
 1    because I think the documents relating to this
 2    investigation, I think we actually attached.
 3              Okay, let me just refer this to you.
 4    It's EEOC 001706.  This is Exhibit No. 3 for
 5    identification.
 6              Sorry, could I take a look at this for
 7    a second?  I want to make sure the document we're
 8    looking at is -- okay.  Yes.
 9       A      It seems right.
10       Q      Okay.  I just wanted to...
11       A      Okay, I've reviewed.
12       Q      Okay.  So the document that's marked
13    EEOC 00106 on Exhibit 3, was that a report that
14    was submitted to the hotline?
15       A      Sorry, what was the number?
16       Q      I think it was 1 -- 00106, I believe.
17    The one you just reviewed I'm talking about.
18       A      Okay.
19       Q      I don't have a copy with me.  Is it
20    001706, right --
21       A      Correct.
22       Q      -- the document?
23              Is that a report that's generated when
24    an employee or somebody contacts the HR hotline?
25       A      Yes, it is.
```

1      Q      Okay.   And was this something that was

2    brought to the attention of the NCPS human

3    resources department?

4      A      Via legal, yes.

5      Q      Was there an investigation of the

6    allegations made by -- was this -- does it

7    include allegations made by Zach Johnson in this

8    particular document?

9      A      Yes.

10     Q      And was he basically saying he thought

11   he was being retaliated against for speaking to

12   NCPS human resources?

13     A      I don't think he used those words, no.

14     Q      Did he tell human resources that he

15   thought somebody had given Chris Jones

16   information about what he had told them in

17   confidence during his interview?

18     A      He did think that.

19     Q      Was there any investigation conducted

20   by NCPS as to whether or not information had been

21   leaked to Chris Jones?

22     A      Yes.   But it's included here.

23     Q      Do you know -- from your knowledge, was

24   there -- what was the result of the

25   investigation?

```
 1        A      Deidre.

 2        Q      Did you ever talk with him directly

 3   concerning his report to the hotline?

 4        A      Not with this claim, no.

 5        Q      Now, going back to Exhibit No. 15, the

 6   next page -- this is the one marked Nabors --

 7   it's marked Nabors/EEOC 011648.

 8        A      Okay.

 9        Q      Does this particular page document a

10   call from Trevor Corley that you received

11   concerning an incident in the work site after he

12   was interviewed by NCPS?

13        A      Yes.

14        Q      Now, did you receive -- did he call you

15   directly?

16        A      He called my cell phone.  I was sitting

17   in the conference room at the Pleasanton office.

18        Q      And when he talked to you, what

19   specifically did he tell you, if you remember?

20   What was his version of what happened?

21        A      Exactly what I wrote here.  Heath tried

22   to pull him out of the truck.  Trevor got it

23   shut -- which I believe was the door -- and took

24   off.  He is scared.

25        Q      Now, would you agree that your notes
```

1    don't indicate any sort of reason why Heath would

2    have pulled him out of the truck?  He doesn't

3    describe in these notes what reason Heath

4    purportedly tried to pull him out of the truck?

5         A    It says right below there, Heath said,

6    did you tell Brian I don't know how to run the

7    floor pump.

8         Q    So according to these notes, the reason

9    why Heath told -- or Heath supposedly asked him

10   about whether he told Brian he doesn't know how

11   to run the floor pump?

12        A    Yes.

13        Q    So that was the comment made to him

14   about why -- that's the comment that prompted

15   this incident involving Heath?

16        A    That's what Trevor said.  And Trevor

17   was there.

18        Q    And then did you talk to -- it says,

19   "Brian tried to calm Heath down."

20             Is that a comment made by Trevor

21   Corley?

22        A    Yes.

23        Q    "And Heath just tried to pull Trevor

24   out of truck"?

25        A    Yes.

1        Q      And then below that it's got a date.

2   Is he saying that this happened around 1:00 p.m.

3   on October -- is that October?

4        A      That looks like 5th.

5        Q      Okay.  2012?

6        A      I would say that's correct.

7        Q      And then you wrote, "Danny standing

8   out, telling everyone what's" -- and what did you

9   write?

10       A      I don't know.  I didn't write anything

11  else.

12       Q      What was Danny -- what did Corley claim

13  Danny was standing out telling people?

14       A      I don't know.  I didn't finish the

15  sentence.

16       Q      Then after Trevor called you, did you

17  call Brian Turner?

18       A      I pulled Brian into the office.

19       Q      Okay.  And so the notes at the bottom

20  of this page reflect what he said when he was

21  interviewed by you?

22       A      Yes.

23       Q      Was John Lewis also present during this

24  interview?

25       A      I believe he was.

1      Q      What about Deidre?

2      A      I don't know if Deidre was.

3      Q      So is he claiming -- is Brian Turner

4   claiming that Trevor is the person who instigated

5   this incident?

6      A      He said that Trevor said something to

7   Heath, and then that Trevor kicked the door open

8   at Heath.

9      Q      And then did you write, "said Trevor

10  likes to run his"?

11     A      Yes.  And he said "mouth," and I don't

12  know why I didn't write that.

13     Q      Okay.  And then below that it looks

14  like you wrote "cameras," right?

15     A      Yes.

16     Q      Did you check any sort of cameras at

17  the work site?

18     A      That was a note to me to find out if we

19  could pull the cameras.

20     Q      Was there a video camera in the

21  location where this incident purportedly

22  happened?

23     A      There are cameras outside.

24     Q      Did you all pull the camera or video to

25  see if there was any sort of video evidence of

```
 1   what happened?
 2        A     I don't have that authority.  I had to
 3   send that request to legal.
 4        Q     Did you actually do that request?
 5        A     I did.
 6        Q     Did you get any sort of response?
 7        A     I don't know if I can tell you that.
 8        Q     Well, I guess you can tell me
 9   whether --
10              MR. CLEARY:  It's a yes or no question.
11              THE WITNESS:  Yes, I did get a
12   response.
13   BY MR. RIVELA:
14        Q     Okay.  Did you ever get the video
15   footage?
16        A     I did not personally see it.
17        Q     Do you know whether the video
18   footage -- was there video footage that actually
19   showed what happened during the incident?
20        A     I didn't review it, so I can't answer
21   that.
22        Q     You don't know?
23        A     I don't know.
24        Q     Did anybody tell you whether there was
25   video footage that showed the situation that
```

```
 1   happened involving Trevor Corley and Heath Lappe?
 2        A    They did not.
 3        Q    Did you ever follow up with anybody to
 4   find out if that video footage existed?
 5        A    I did.
 6        Q    Did you get any sort of confirmation as
 7   to whether the video footage existed?
 8        A    The video -- I did get confirmation of
 9   that, yes.
10        Q    Okay.  But you were never allowed to
11   actually look at the video?
12        A    Correct.
13        Q    Were you given any explanation as to
14   why you couldn't look at the video?
15        A    I didn't ask.  If legal reviewed it, I
16   felt comfortable with that.
17        Q    Do you know whether that video was
18   preserved?
19        A    That's not in my jurisdiction.
20        Q    Well, as HR human resources
21   coordinator -- or I'm sorry, human resources
22   director, I'm sure you've had situations where
23   there's been an EEOC charge.
24             In this case there was, right?  And
25   don't you normally --
```

```
 1        A      I don't know that there was any solid

 2   information.  He was included in the James and

 3   company group that a couple people had mentioned

 4   at the RV park.

 5        Q      Okay.  Did you -- were there any

 6   interviews of witnesses concerning the allegation

 7   about Adam Crews and the camera?  Do you know

 8   whether or not the company did an investigation

 9   and interviewed other witnesses?

10        A      I don't know that.

11        Q      Okay.  Looking at Nabors/EEOC 011649,

12   did you end up interviewing somebody named

13   interviews Terence Smith concerning the

14   allegations made by Daniel -- by Duane Jewell?

15        A      This says Terence.  I will assume this

16   is Terence Smith.

17        Q      Did Terence Smith tell you that he felt

18   he was being discriminated based on race in

19   assignments?

20        A      No, I don't believe I see those words

21   anywhere in my notes.

22        Q      Okay.  Now, Terence Smith ended up

23   filing a charge of discrimination, right?  Do you

24   know?

25        A      I think he was one of them.
```

```
 1    Nabors/EEOC 011652.
 2              Does this page contain notes of an
 3    interview with Gary Watson?
 4         A    Yes.  And I think this was about a week
 5    later.
 6         Q    Week later than what?
 7         A    The other interviews.
 8         Q    Okay.  Now -- so, can you explain to
 9    me, did he tell you that there had been
10    separation?
11         A    Well, Gary Watson, the reason, I
12    believe, that this interview was conducted is,
13    after James and Brian were suspended, John Lewis
14    had a sit-down meeting with the entire coil
15    tubing department, had a question-and-answer
16    session.  The meeting ended with everybody
17    shaking hands.  John also opened his door to say,
18    come talk to me if you have an issue.
19              Gary Watson reached out to John
20    directly and said, I'd like to speak.  And I
21    believe that's why I came down and conducted this
22    interview.
23         Q    Did Gary Watson tell John Lewis during
24    the meeting -- did he identify employees who he
25    feel -- who were being discriminatory toward
```

```
 1        A       Okay, I've read it.
 2        Q       Have you seen this e-mail before?  Do
 3   you know, had you ever received it?
 4        A       I don't know if I received the e-mail
 5   or talked to John Lewis about it, but it is
 6   familiar to me.
 7        Q       Okay.  So did John Lewis have a
 8   discussion with you as to how to go about
 9   addressing Mr. Corley's claim that he's been --
10   that he doesn't want to participate in an
11   investigation based on threats?
12        A       I believe so, because I was still in
13   the Pleasanton office doing investigations on
14   this date.
15        Q       On October 5, 2012?
16        A       Yes.
17        Q       Did you speak with Trevor Corley
18   concerning his participation in the
19   investigation?
20        A       I did.
21        Q       What did you tell him?
22        A       I asked Trevor to continue
23   participating.  I told him that we appreciated
24   his participation thus far, that any type of
25   retaliation would not be tolerated from the
```

```
 1       A      He does.  Next Wednesday, actually.
 2   He'll be a year.
 3       Q      Okay.  And since we're in western
 4   Pennsylvania, does this mean that you're a
 5   Steeler fan?
 6       A      Hundred percent.
 7       Q      Okay.  All right.  So let's talk about
 8   the investigation that you conducted all the way
 9   back in 2012.
10              So when you first began hearing about
11   these issues, tell us what you did.
12       A      So it's our practice to take anything
13   seriously that we hear about, No. 1; and No. 2,
14   immediately investigate and look into it.
15              So my first course of action, if I'm
16   not physically somewhere, is to jump on the phone
17   and get some information.  And then as soon as I
18   can physically get to a location, I like to go
19   there personally and start some investigations.
20       Q      Now, as part of your investigation, was
21   the Nabors corporate law department involved?
22       A      On a typical basis, they're not.  In
23   this investigation, they were very involved, and
24   they did drive the investigation.
25       Q      So this would -- the investigation you
```

```
 1   conducted into these claims is different in the
 2   sense that the corporate law department is
 3   typically not involved?
 4        A       That is correct.
 5        Q       But here they were actually driving the
 6   investigation?
 7        A       They drove the entire investigation.
 8        Q       Okay.  And who were the people that you
 9   were either reporting to or receiving directions
10   from on the legal side?
11        A       I worked with three different
12   attorneys; Laura Doerre, Grant Dorfman and Julia
13   Wright.
14        Q       Would you also be working with any
15   outside lawyers?
16        A       Yes.
17        Q       Do you happen to remember their names?
18        A       Elizabeth Kroeger.
19        Q       Okay.  So -- and then, of those four
20   people, was there maybe one in particular that,
21   you know, would spend most time on this issue or
22   that you reported to most?
23        A       I worked with Julia most closely.
24        Q       Okay.  And I want to talk -- maybe I
25   need to back up a little bit -- but in regards to
```

```
 1      A     No.
 2      Q     All right.  So let me switch gears a
 3   little bit.  I realize this happened almost six
 4   years ago, but how did you come to learn about
 5   the race discrimination issues that were being
 6   alleged or taking place in Pleasanton?
 7      A     When John Lewis had talked with Duane
 8   Jewell -- or Duane Jewell had come to talk to
 9   John Lewis, that is the -- the very first lump of
10   information we received to start investigating.
11      Q     And we've looked at documents.  So this
12   would have been in late September of 2012?  Does
13   that --
14      A     That sounds right.
15      Q     -- sound correct?  Okay.
16            So after Mr. Lewis brought you up to
17   speed about his conversation with Duane Jewell,
18   what do you do?
19      A     Got on the phone immediately that day,
20   made legal aware, because it was a discrimination
21   claim, and then I headed to Pleasanton
22   physically.
23      Q     To do your interviews?
24      A     Correct.
25      Q     Do you know how much time elapsed
```

1    between when you first hear from Lewis and when

2    you go to Pleasanton?

3        A    It was the very next day.

4        Q    Okay.  And who directs you to go to

5    Pleasanton, if anyone?

6        A    So it was actually Julia Wright and

7    Elizabeth Kroeger.  Elizabeth was in Julia's

8    office.  She happened to be in that day.  And I

9    walked up to talk to Julia and they said, "You

10   need to physically go there."  And I left the

11   next morning.

12       Q    And so let's take a look at Exhibit 15.

13   These are some of your handwritten notes.

14       A    Okay.

15       Q    And my understanding is, these are the

16   notes that you took when you went down to

17   Pleasanton and started interviewing people.

18       A    Correct.

19       Q    Okay.  So before we dive into the

20   notes, I want to ask you just some general

21   questions.

22            So what was your goal in regards to

23   these interviews?  What was -- what were you

24   trying to achieve?

25       A    My goal was -- and I think I stated

1    time as they need to disclose anything they feel

2    like they should.

3        Q      Then in regards to the notes that you

4    took, do you feel like you captured everything of

5    significance that they told you?

6        A      Absolutely.   I take the notes for

7    myself so that I can remember, and I also tell

8    them that I'm taking them.   And they can see,

9    everything they say, I'm writing it down.   And

10   when I'm done with these notes, I then type them

11   up, with any additional thoughts I may have and

12   send them to legal so that we have good records.

13       Q      And do you feel like these notes

14   capture the concerns -- let me -- let me ask you

15   this way: I mean, is it possible that somebody

16   told you about something they viewed as

17   discriminatory but it's not written down in your

18   notes?

19       A      No.   No. 1, that's something very

20   important I wouldn't omit from my notes.   And

21   No. 2, I have no benefit of not including that.

22       Q      Well, I mean, there is one benefit, and

23   that is, there's no record of the discrimination,

24   right?

25       A      I don't view that as a benefit.   My job

1                          CERTIFICATE

2

COMMONWEALTH OF PENNSYLVANIA,        )
3                                     )  SS:
COUNTY OF BLAIR.                      )

4

     I, Susanna C. Englert, do hereby certify that
5    before me, a Notary Public in and for the
     Commonwealth aforesaid, personally appeared TRACEE
6    QUINNELL, who then was by me first duly cautioned
     and sworn to testify the truth, the whole truth,
7    and nothing but the truth in the taking of her oral
     deposition in the cause aforesaid; that the
8    testimony then given by her as above set forth was
     by me reduced to stenotypy in the presence of said
9    witness, and afterwards transcribed by means of
     computer-aided transcription.

10

     I do further certify that this deposition was
11   taken at the time and place in the foregoing
     caption specified, and was completed without
12   adjournment.

13   I do further certify that I am not a relative,
     counsel or attorney of either party, or otherwise
14   interested in the event of this action.

15   IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my seal of office at Altoona,
16   Pennsylvania, on the 4th day of June 2018.

17

18   Susanna C. Englert, Notary Public
     My commission expires May 9, 2022

19

20                          - - -

21

22

23

24

25